No. 24-8071

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

Jake Stanley DeWilde

*Plaintiff - Appellant,*

v.

Attorney General of the United States; Director of the
Bureau of Alcohol, Tobacco, Firearms, and Explosives,

*Defendants - Appellees.*

---

On Appeal from the United States District Court for the District of Wyoming
The Honorable Chief Judge Scott W. Skavdahl
No. 2:24-cv-00084-SWS

---

## APPELLANT'S REPLY BRIEF

---

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES .................................................................... ii

INTRODUCTION ................................................................................... 1

ARGUMENT .......................................................................................... 2

    I.    The Government Improperly Advances a "No Set of Circumstances" Facial Test ....................................................................................... 3

    II.   The Possession of an M16 Service Rifle is Protected by the Second Amendment ............................................................................... 5

        A. *The Plain Text of the Second Amendment Presumptively Protects the Possession of an M16* ............................................. 14

        B. *There is no Historical Tradition of Prohibiting the Possession of the Standard-Issue Service Rifle of the United States Military* ..... 21

CONCLUSION ..................................................................................... 28

CERTIFICATE OF COMPLIANCE .................................................... 29

CERTIFICATE OF SERVICE ............................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015)...................................11

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)........................................................7

*DeWilde v. United States*, No. 23-8054 (10th Cir. Apr. 10, 2024)...........................7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................................

................... 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19, 20, 22, 27, 28

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011)....................................................15

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)........................14

*Jama v. Immigration and Customs Enforcement*, 543 U.S. 335 (2005)...................6

*John Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .........................4

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)..........................................................21

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ..............................................14

*Luis v. United States*, 578 U.S. 5 (2016)..................................................................15

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022)......................

.......................................... 2, 3, 5, 8, 10, 11, 13, 14, 16, 21, 22, 24, 25, 26, 27

*Teixeira v. Cnty. Of Alameda*, 873 F.3d 670 (9th Cir. 2017) ..................................15

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ................................8, 11

*United States v. Miller,* 307 U.S. 174 (1939) ..........................................................13

*United States v. Nixon*, 919 F.3d 1265 (10th Cir. 2019) ...........................................8

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................3

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ...........................................26

*United States v. Rahimi*, 602 U.S. 680 (2024)........... 1, 3, 10, 11, 14, 22, 23, 24, 25

*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024)........................................9

*Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023)...................................................9

## **CONSTITUTION**

U.S. Const. Amend. II...............................................................................................20

## **STATUTES**

18 U.S.C. § 922(g)(8).................................................................................................4

18 U.S.C. § 922(o) ................................................... 1, 22, 23, 24, 25, 27, 28

18 U.S.C. § 963 .........................................................................................................19

Neutrality act of 1794 ........................................................................................ 17-18

## **RULES**

Fed. R. App. P. 32(a)(5)...........................................................................................29

Fed. R. App. P. 32(a)(6)...........................................................................................29

Fed. R. App. P. 32(a)(7)(B)(ii) ...................................................................29

Fed. R. App. P. 32(f) ...................................................................................29

## LEGISLATIVE MATERIALS

132 Cong. Rec. 9600 (1986) ...............................................................25, 27

ATF's Assault on the Second Amendment: When is Enough Enough? Joint

      Hearing Before the House Committee on Oversight and Accountability,

      Committee on the Judiciary, 118th Cong., 1st Sess. (2023) ........................15

National Firearms Act: Hearings Before the House Committee on Ways and

      Means, 73rd Cong., 2d Sess. (1934).............................................................27

## OTHER AUTHORITIES

Act of March 23, 1776 (Continental Congress).......................................................16

Donald B. Chidsey, *The American Privateers* (1962)..............................................16

Edgar Stanton Maclay, *A History of American Privateers* (1899) ..........................17

Gregory E. Fehlings, Lieutenant Colonel, U.S. Army Reserve, *America's First*

      *Limited War* (2000).........................................................................................17

Hamilton, Alexander, Federalist 29, THE FEDERALIST PAPERS .........................19, 20

Horatio Davis Smith, *Early History of the United States Revenue Marine Service* (1989) ............................................................................................17

John Adams, *Message to the Senate and House* (March 19, 1798) .......................18

John Adams, *Special Message to the Senate and the House* (May 16, 1797).........17

John D. Pelzer, *Armed Merchantmen and Privateers: Another Perspective On America's Quasi-War With France* (1990) .............................................17, 18

John N. Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868)............................................................................................20

Letter from Albert Gallatin to Thomas Jefferson (June 7, 1804) ...........................17

Madison, James, Federalist 46, THE FEDERALIST PAPERS .......................................20

The Declaration of Independence (U.S. 1776) .......................................................20

Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* (1880) .............................................................................15

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union*, 2nd ed. (1871) ....................................................................................................20

## INTRODUCTION

The founding generation possessed the most advanced weaponry known to man – the musket. Useful for self-defense, common defense, and waging war, the technological advancements of the musket provided capabilities never previously imagined. The smoothbore musket was widely owned and used by the first Americans, who understood the importance of possessing the pioneering arms of the modern-day. And when British General Thomas Gage "dispatched soldiers to seize the local farmers' arms and powder stores,"[1] the Founders responded by starting – and finishing – the American Revolution. Realizing the means necessary to secure our independence, they codified the right to keep and bear arms into a constitution to endure generations and, hopefully, to prevent such tyranny from occurring in America once more. Those ideals of the Founders when they created our constitution are timeless, and they are controlling here.

18 U.S.C. § 922(o) is unconstitutional. The statute violates the Second Amendment right to possess the lineal descendant of the musket and the U.S. military's standard-issue service rifle, the M16. In its response brief, the government argues in support of the prohibition on M16s by classifying the rifle as "dangerous and unusual," not in "common use," and prohibited by *Heller*'s dicta. The

---

[1] *United States v. Rahimi*, 602 U.S. 680, 690 (2024).

government's obsolete, pre-*Bruen* approach of circumventing constitutional analysis by pointing to *Heller*'s enfeebled dicta and abrogated post-*Heller* methodology does not comport with the updated, binding Supreme Court precedent that this Court must adhere to.

*Bruen* elucidated the framework for Second Amendment challenges. The Supreme Court clarified the text, history, and tradition test established by *Heller*. Courts *must* determine [1] whether the plain text of the Second Amendment covers an individual's conduct, and [2] whether the government evinces a historical tradition, originating at the founding, of regulating the presumptively unconstitutional regulation. That inquiry requires courts to yield to those ideals understood and protected by the Founders, who *did not tolerate* a prohibition such as that challenged here. Because there is no historical tradition of *totally banning* the simple possession of our Nation's standard-issue service rifle, the challenged statute is unconstitutional.[2]

---

[2] This reply brief is intended solely to respond to the government's contentions requiring further discussion for proper determination of issues raised on appeal. This brief does not respond to issues that DeWilde believes were adequately discussed in his opening brief, and DeWilde intends no waiver of those issues by not expressly reiterating them here.

**ARGUMENT**

**I.      The Government Improperly Advances a "No Set of Circumstances" Facial Test.**

Like the district court, the government would forego the constitutional inquiry clarified in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022) for a "no set of circumstances" test derived from *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See* Brief for Appellees ("Gov't Br.") at 32-33. DeWilde comprehensively explained how this Court has rejected that approach and instead requires that constitutional challenges be conducted with "the relevant constitutional test." *See* Appellant's Opening Brief ("Aplt. Br.") at 14-22. The government acknowledges this requirement by insisting that the district court "did" conduct that test, because it "assessed whether DeWilde's arguments for why his [M16] was protected by the Second Amendment extended to all machineguns." Gov't Br. at 54. But the government does not identify where in the *Bruen* analysis such an assessment is permitted, much less mandated. That omission is surely because it is not a part of prong one or two of the "relevant constitutional test" under *Bruen*.

The government argues that the district court's assessment "is what *Rahimi* instructed courts to do when they adjudicate a facial challenge to a federal firearms law." Gov't Br. at 54 (citing *Rahimi*, 602 U.S. at 693). The government misreads

3

*Rahimi*. The Supreme Court merely acknowledged "the *result* of [Rahimi's] facial challenge" after the Court applied "the appropriate constitutional standard" under *Bruen*. *John Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012) (emphasis added).

The Supreme Court has consistently applied this principle. *District of Columbia v. Heller*, 554 U.S. 570 (2008) did not uphold the District of Columbia's prohibition on handgun possession because the district could prohibit the possession of *some hypothetical* arms. *Bruen* did not uphold New York's prohibition on concealed carry because the carrying of firearms could be prohibited in *some hypothetical* places. *Rahimi* did not uphold the federal ban on firearm possession by individuals covered by 18 U.S.C. § 922(g)(8) because the possession of firearms may be prohibited by *some hypothetical* groups of people. The Supreme Court performed the "relevant constitutional test" in *all* of those cases, which applied "the terms of the statute" to the conduct at issue, "not hypothetical applications." *Doe*, 667 F.3d 1111, 1127. Accordingly, the government was put to task with using analogical reasoning to identify a historical tradition, originating at the founding, that justified the prohibitions at issue. This Court must require the same here.

## II.     The Possession of an M16 Service Rifle is Protected by the Second Amendment.

"*Bruen* did not abrogate any part of the Court's opinion in *Heller*." Gov't Br. at 31. But importantly, *Bruen* abrogated many Second Amendment cases decided in lower courts following *Heller*. The government "urge[d the Supreme Court] to adopt" a means-end scrutiny test for Second Amendment cases. 597 U.S. at 23. But "*Heller* decline[d] to engage in means-end scrutiny." *Id*. Nonetheless, for fourteen years, courts demonstrated rampant disregard for *Heller*'s historical tradition test, and instead implemented the government's test, which was "expressly rejected" in *Heller*. *Id*. The Supreme Court righted the course in *Bruen*, which abrogated every post-*Heller* pre-*Bruen* authority offered by the government here that failed to perform the text, history, and tradition inquiry in Second Amendment challenges. But the government's *modus operandi* remains unchanged, arguing that pre-*Bruen* dicta is controlling in order to circumvent *Bruen* altogether. This Court must reject the government's continued reliance on a methodology that the Supreme Court has consistently rejected.

**Heller*'s Machinegun Dicta*

The government's argument significantly relies on two remarks made in *Heller*. *See* 554 U.S. at 624 (characterizing as "startling" the notion that the NFA's

restrictions on machineguns might be unconstitutional); *id*. at 627 (proposing hypothetical arguments in a hypothetical case challenging a ban on M-16s). The government argues this dicta makes "clear that the Second Amendment does not extend to machineguns, including M-16s," Gov't Br. at 28, and that DeWilde "offers no basis on which to ignore that limitation." *Id*. at 30. These arguments have no merit.

"Dict[a] settles nothing, even in the court that utters it." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 352 n.12 (2005). Justice Scalia reemphasized this principle in *Heller*, writing that "[i]t is inconceivable that [the Supreme Court] would rest [it's] interpretation of the basic meaning of any guarantee of the Bill of Rights upon… dict[a] in a case where the point was not at issue and was not argued." 554 U.S. at 625, n.25. Yet here, that is exactly what the government argues. The government relies on dicta that bore no relation to the holding in *Heller*. Indeed, if *Heller*'s dicta explicitly stated the opposite of what the government argues (e.g., that M16s are protected arms), such dicta could only have *supported Heller*'s holding that the possession of handguns may not be prohibited. The Supreme Court did not mention nor consider the statute challenged in the instant case. Furthermore, the M16 dicta in *Heller* is not recent, and it has never been repeated nor endorsed by the Supreme Court.

*Heller* did not determine that M16 rifles "may be banned." 554 U.S. at 627.

The Court merely analogized a hypothetical challenge and argument (which is nearly

identical to the instant case), as it often does, to support the conclusion that "the fact

that modern developments have limited the degree of fit between the prefatory clause

and the protected right cannot change our interpretation of the right." *Id*. at 627-628.

Thus, when the government argued that M16s may be banned because "no amount

of small arms could be useful against modern-day bombers and tanks,"[3,4] its

argument was impermissible, because such an ahistorical conjecture "cannot change

our interpretation of the right." 554 U.S. at 628.

The Court surely included this passage to maintain that arguments about the

relevance of the prefatory clause *given* modern technological advancements have no

historical basis in nullifying the text. *See Caetano v. Massachusetts*, 577 U.S. 411,

419 (2016) (per curiam) (Alito, J., concurring) ("Indeed, *Heller* acknowledged that

---

[3] *See* Brief for Appellees at 58, *DeWilde v. United States*, No. 23-8054 (10th Cir. Nov. 6, 2023) (quoting 554 U.S. at 627).

[4] *Heller* qualified this argument, saying that "it *may* be true." 554 U.S. at 627 (emphasis added). Indeed, like *Heller*'s other enfeebled dicta the government relies on, the Court gave no consideration to whether "small arms could be useful against modern-day bombers and tanks." *Id*. Surely if such an inquiry was earnestly before this Court, *and* it was relevant or permissible, examples could be provided of occasions, between the time *Heller* was decided and now, where America's enemies found that small arms *were*, in fact, useful against forces that employed modern bombers and tanks. But no such inquiry must be supported here; the Supreme Court has rejected the government's argument, and this Court should do the same.

advancements in military technology might render many commonly owned weapons ineffective in warfare… But such 'modern developments… cannot change our interpretation of the right.'") (internal citations omitted) (citing 554 U.S. at 627-628). Such a misinterpretation is precisely what the government advances here.

"[T]he Supreme Court's dicta is almost as influential… as its holdings," *United States v. Nixon*, 919 F.3d 1265, 1273 (10th Cir. 2019). But "almost as influential" necessarily ascertains that *some dicta* fall short of holdings. To be sure, prior to *Bruen*, the government's reliance on *Heller*'s dicta was concerning, because that "dict[a] inhibit[ed] lower courts from exploring the contours of *Heller* and its application to firearm restrictions." *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, T., concurring). But *Heller*'s dicta has been overwhelmingly enfeebled by *Bruen*'s clarification, which is that identification of protected conduct at the first prong of a Second Amendment challenge consists of a strictly "textual analysis." 597 U.S. at 20. As such, this Court may no longer "simply reference the applicable *Heller* dictum and move on." *McCane*, 573 F.3d at 1050 (Tymkovich, T., concurring). It must "apply" the "Second Amendment [test]" clarified by *Bruen*. *Id*.

This conclusion finds support in *Heller*. The Court did not assert its dicta as being the end of the matter. Contrarily, the Court acknowledged that it did "not provid[e] extensive historical justification for those regulations of the right that [the

Court] described as permissible." 554 U.S. at 635. That is because *Heller* "represents [the] Court's first in-depth examination of the Second Amendment." 554 U.S. at 635. The Court emphasized that "there will be time enough to expound upon the historical justifications for the exceptions [it has] mentioned." *Id*. Indeed, "applying *Heller*'s dicta uncritically would be at odds with *Heller* itself, which stated courts would need to 'expound upon the historical justifications' for firearm-possession restrictions when the need arose." *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024) (quoting 554 U.S. at 635). This case is just one of those occasions.

**Dangerous and Unusual**

The government posits that M16s may be banned because they are "dangerous and unusual" weapons as mentioned in *Heller*'s dicta.[5] Gov't Br. at 28, 29, 32 n.3, 35, 36, 37, 38, 40, 42, 43, 44, 47. This argument fails for similar reasons as the government's erroneous reliance on *Heller*'s machinegun dicta. The Court merely

---

[5] The government briefly suggests, Gov't Br. at 47, that DeWilde concedes that an M16 is "dangerous and unusual" because he "ma[de] no argument" to the contrary in his opening brief. The government is mistaken, and DeWilde made no such concession. DeWilde explained why the district court was wrong to rely on this dicta in *Heller*, and here, he expounds upon that explanation. *See* Aplt. Br. at 27 (explaining why the district court can no longer draw on methodology utilized in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) of relying on *Heller*'s dicta for Second Amendment cases, including the "dangerous and unusual" dicta (quoting ROA at 66-67)); *see also id*., at 29-30 (explaining that the "dangerous and unusual" dicta referred to "authorities" that must be analogically reasoned with at *Bruen*'s second prong, *not* a class of weapons that must be proven.

mentioned, once, a reference to the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 627. Far from being necessary to the Court's holding, this dicta, taken in context, simply attempted to place a limit on its holding. The Court articulated that it did "not undertake an exhaustive historical analysis [in *Heller*] of the full scope of the Second Amendment." *Id*., at 626. And when the Court acknowledged this dicta in *Bruen* and *Rahimi*, it likewise acknowledged the limits of its analysis in those instances. *See* 597 U.S. at 31 ("Like *Heller*, we 'do not undertake an exhaustive historical analysis… of the full scope of the Second Amendment.'") (quoting *id*.); 602 U.S. at 702 ("In *Heller*, *McDonald*, and *Bruen*, this Court did not 'undertake an exhaustive historical analysis… of the full scope of the Second Amendment.' Nor do we do so today.") (internal citation omitted) (quoting 597 U.S., at 31). Contrary to the government's assertion that "[t]here is no need to perform an independent inquiry" here, the Supreme Court's acknowledgements indicate that the limits of the Second Amendment right are far from defined. Gov't Br. at 32.

Moreover, the government is incorrect to argue that *Heller*'s dangerous and unusual authorities, if they *were* acceptable historical analogues, would come in to play when performing the strictly textual analysis of the Second Amendment. *Heller itself* identified the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons. *See* 554 U.S. at 627. *Heller* did not reference the dangerous and

unusual authorities when conducting the textual analysis of the Second Amendment. The Court reiterated this approach in *Bruen* and *Rahimi*, which both performed analysis of the dangerous and unusual authorities at the *second prong*. *See* 597 U.S. at 46, 47; 602 U.S. at 697. Neither *Heller*, *Bruen*, nor *Rahimi* considered the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons at the textual analysis. The government's argument is especially capricious when it applies the *tradition* of prohibiting the carrying of dangerous and unusual weapons at both prongs.

The government argues that *Heller*'s qualification on the limitations the Supreme Court described in dicta "refers to *other* exceptions outlined in the opinion" Gov't Br. at 32 n.3 (emphasis added), and that it would not apply to the "dangerous and unusual" dicta. Yet those *other* exceptions, *Heller*'s "longstanding prohibitions," are exactly what the government argues this Court should analogize the instant case to. *See* Gov't Br. at 30 (citing *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124 (10th Cir. 2015); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)). The government argues that this Court's pre-*Bruen* approach in *Bonidy* and *McCane* of relying on "[dicta] in *Heller*" "is warranted with respect to the federal machinegun ban here." *Id*. The government's contradiction cannot be reconciled, but more importantly, this Court's pre-*Bruen* approach has been

foreclosed by *Bruen*, which confirms that this Court must "expound upon the historical justifications" for the M16 prohibition. 554 U.S. at 635.

**Common Use**

The government argues that the "arms" in the Second Amendment's text *only* refers to arms that were "in common use" when the traditional militia was called for service. Gov't Br. at 33 (citing 554 U.S. at 624-25). But pointing to a *historical tradition* is not how a "textual analysis" works, and the Supreme Court made no such determination. While *Heller* reaffirmed that arms in common use are protected, the common use test is just one method of protection; it is not a minimum threshold question. Accordingly, *Heller* held that handguns were *protected* arms because they were in common use, not that handguns were *textually "arms"* because they were in common use.

The government attempts to circumscribe this holding to say that the common use test *only* applies to arms possessed by the citizenry. *See* Gov't Br. at 26 ("There is no authority indicating that the issuance of a firearm to members of the military on active duty counts for this inquiry, which concerns the constitutional rights of private people as individuals."). But there is such authority. The government's argument ignores *Miller*'s historical conclusion derived "from the debates in the Convention, the history and legislation of Colonies and States, and the writings of

approved commentators." *Miller*, 307 U.S. at 179 (1939). The Court found that "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in *common use* at the time." *Id*. Thus, *Miller* focused on whether the arm at issue, for purposes of bringing arms to *militia service*, was commonly used by the U.S. military.[6] *Miller* did not even *consider* whether the weapon at issue was commonly used amongst the citizenry.

Importantly, the government's interpretation of the common use test lacks any limiting principle with respect to *what* future arms a legislature may ban. Under such circular logic, Congress could simply ban the possession of *any new arms* because they are not commonly possessed by the citizenry. But *Heller* rejected such a notion when the Court affirmed that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding*." 554 U.S. at 582 (emphasis added). The Supreme Court thus recognized that technological advancements occur, and new weapons resulting from those advancements are protected. *See also* 597 U.S. at 47 (even if an arm *were* dangerous and unusual, its common usage protects its possession).

---

[6] At the founding, the militia was considered to be at least equivalent to the professional standing military. *See infra*., at 19 ("Prefatory Clause").

Indeed, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning... it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). But in an incredible endorsement of this circular logic, the government emphatically argues that machineguns may be banned because they are not "in common use," Gov't Br. at 28, 32, 33, 34, 35, 43, 49, 50, because "with the ban on new machineguns, th[e] number [of machineguns in common use] can only decrease over time," *id*., at 47, so they "are not typically possessed [and in common use]" and can thus be banned. *Id*. The government's interpretation of the common use test is untenable, and this Court should reject it.

A.    *The Plain Text of the Second Amendment Presumptively Protects the Possession of an M16.*

**Unqualified Text**

"Like most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626.  But the text of the Second Amendment is "unqualified." 597 U.S. at 17, 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)); *also Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring). The government disagrees, arguing that "the Second Amendment by its terms protects

*only* the right to 'keep and bear Arms.'" Gov't Br. at 55 (emphasis added). But "only" does not exist in the text of the amendment, and it would have to if there was a "textual[] limit[]." *Id*. And although the government asserts its view as "supported by the definitions of those terms at the time," its argument is unavailing. *Id*.

The right "to bear arms implies something more than the mere keeping." 554 U.S. at 617 (citing Thomas Cooley, General Principles of Constitutional Law 271 (2d ed. 1891)). The Second Amendment right "implicitly protect[s] those closely related acts necessary to [its] exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). For instance, the right to keep and bear arms "wouldn't mean much without the ability to acquire arms." *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (*quoting Ezell v. City of Chi*., 651 F.3d 684, 704 (7th Cir. 2011). Neither the text of the Second Amendment nor the definitions of its terms provide a "right to acquire arms," but Americans obviously possessed the right to *acquire* the "approximately 400 million privately owned firearms in the United States."[7]

*Bruen*'s textual analysis determines whether the conduct at issue was understood to be within "the scope" of the text "when the people adopted" it. 554

---

[7] ATF's Assault on the Second Amendment: When is Enough Enough? Joint Hearing Before the House Committee on Oversight and Accountability, Committee on the Judiciary, 118th Cong., 1st Sess., 6 (2023) (Statement of Rep. Bush).

U.S. at 634-635. The textual limits advanced by the government contravene "the traditions of the American people" and controlling Supreme Court precedent. 597 U.S. at 26.

**"Arms"**

Similarly, the government argues that the "arms" in the text are *limited* to "bearable arms." Gov't Br. at 55. Importantly, the government does not dispute that the arm at issue in the instant case, the M16, is a bearable arm. Nonetheless, in support of its improper "no set of circumstances" test,[8] the government contends that its "bearable" limit is permissible because "Congress" and "The Executive Branch understood [themselves] to possess th[e] authority" to "disarm private armed vessels." *Id*., at 56. Taking the government's supporting authorities in context, however, demonstrates that its argument represents a misreading of history.

The Continental Congress commissioned the first American privateers.[9] Privateering was "a widely practiced institution in America" and "a way of life."[10] With a "commission, or letter of marque" issued by the government, armed vessels that were privately-owned and outfitted were crucial to providing naval power and

---

[8] *See supra*., at Section I; *also* Aplt. Br. at 6-14.
[9] Act of March 23, 1776 (Continental Congress).
[10] *The American Privateers*, Donald Barr Chidsey (1962).

support necessary to secure our independence.[11] After the American Revolution, "[g]overnment war vessels steadily diminished in number and force" while "privateers increased at [a] remarkable rate."[12] In 1797, following "a series of events which marked a deterioration of Franco-American relations during the late 1790s,"[13] President Washington, in an attempt to "resist[] French efforts to draw America"[14] into the Quasi-war, issued an executive order to "refuse clearances to armed vessels."[15] Secretary of the Treasury Oliver Wolcott Jr., transmitting the order to port collectors, remarked "[t]hese are the only orders within my knowledge *which have ever been issued* to restrain the sailing of armed merchant vessels from the ports of the United States."[16]

The restriction was short-lived. Just months after the order, John Adams was elected to the presidency, and he promptly told Congress that Washington's order "originated solely from a wish to prevent collisions with the powers at war, contravening the act of Congress of June 1794."[17] (referring to the Neutrality Act of

---

[11] Edgar Stanton Maclay, *A History of American Privateers* 7 (1899).

[12] *Id*., at 113.

[13] John D. Pelzer, *Armed Merchantmen and Privateers: Another Perspective On America's Quasi-War With France* 1 (1990).

[14] Gregory E. Fehlings, Lieutenant Colonel, U.S. Army Reserve, *America's First Limited War* 107 (2000).

[15] Letter from Albert Gallatin to Thomas Jefferson (June 7, 1804).

[16] Horatio Davis Smith, *Early History of the United States Revenue Marine Service* 20 (1989) (emphasis added).

[17] John Adams, *Special Message to the Senate and the House* (May 16, 1797).

1794). Recognizing executive limitations, President Adams stated it "remains for Congress to prescribe such regulations" enabling the "defense by individual citizens" "against violations of the law of nations."[18] Following his message, "Adams grew increasingly impatient with Congressional inactivity on the matter of arming merchant vessels;" Congress ultimately failed to act, and on March 18, 1798, Adams revoked the order restraining armed vessels.[19] He told Congress "I no longer conceive myself justifiable in continuing" the restrictions on armed vessels.[20]

Neither Adams' messages to Congress nor his revocation of the order restricting armed vessels supports the government's argument that it was "well understood" that Congress and the Executive Branch could disarm private vessels. Gov't Br. at 56. A single example of executive *fiat*, *revoked by one of the Framers*, does not demonstrate the public understanding of the textual definition of "arms" at the time of the founding.

Rather, the history surrounding American privateers demonstrates a rich tradition of the private ownership of armed vessels, which the founding generation would have understood to be arms which may not be carried. Throughout American history, and especially at the founding, the government has commissioned those

---

[18] *Id.*
[19] John D. Pelzer, 272.
[20] John Adams, *Message to the Senate and House* (March 19, 1798).

privately-armed vessels for the benefit of its interests. And occasionally, in our most desperate times – particularly times of war – The Executive Branch has exceeded its jurisdiction.

To be sure, even today, "citizens of the United States" may own and possess an "armed vessel" "which is manifestly built for warlike purposes," and if Congress passed a law prohibiting the possession of armed vessels, that prohibition could be subject to a constitutional challenge under the Second Amendment.[21] 18 U.S.C. § 963.

**The Prefatory Clause**

The government argues the M16 is not textually protected by the prefatory clause, because "'the militia at the time of the Second Amendment's ratification' was not the standing, professional military that we have today." Gov't Br. at 49 (citing 554 U.S. at 627). This argument has no merit.

Of course, the militia did not consist of the professional standing army, because the Founders believed that "standing armies are dangerous to liberty." The Federalist No. 29 (Alexander Hamilton). They experienced those dangers firsthand

---

[21] Such a constitutional inquiry under *Bruen* would consider [1] whether an armed vessel is an "arm" as the founding generation understood the term, and [2] whether there is a well-established historical tradition, originating at the founding, of totally prohibiting the private ownership of armed vessels.

when a tyrannical king kept "Standing Armies without the Consent of [the legislature]" and "render[ed] the Military independent of and superior to the Civil power." The Declaration of Independence paras. 13, 14 (U.S. 1776). The militia, therefore, is "the only substitute that can be devised for a standing army." The Federalist No. 29 (Alexander Hamilton); *see also* 554 U.S. at 617 (quoting Thomas Cooley, *Treatise on Constitutional Limitations* (1868) ("The alternative to a standing army is 'a well-regulated militia.'")). The "conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service." 554 U.S. at 627. And "a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons." *Id*., at 618 (citing J. Pomeroy, An Introduction to the Constitutional Law of the United States § 239, pp. 152–153 (1868)). Military weaponry is necessary "to secure to the people the ability to oppose themselves in military force." *Id*. The militia was thus understood to be at least at parity with "regular troops," and it was "doubted" that the "militia thus circumstanced could ever be conquered." The Federalist No. 46 (James Madison).

There can be no doubt that the founding generation understood the militia to be "necessary to the security of a free State." U.S. Const. amend. II. The government's argument that the Nation's standard-issue service rifle would be unprotected by the prefatory clause defy the text and principles of the Second Amendment.

**Presumptively Protected Conduct**

This Court should have no difficulty concluding that an M16 is an "arm" according to the plain text of the Second Amendment, and the right to possess an M16 is thus presumptively constitutional under the first prong of *Bruen*. This strictly textual analysis, informed by history, is "straightforward," and the *historical traditions* provided by the government may only be considered at the second prong of the *Bruen* analysis. 597 U.S. at 26. And even if the Court finds that "the historical evidence at this step is 'inconclusive or suggests that the regulated activity is *not* categorically unprotected,'" the Supreme Court has directed this Court still to "proceed to step two." *Id*. at 18 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)).

B.     *There is no Historical Tradition of Prohibiting the Possession of the Standard-Issue Service Rifle of the United States Military.*

The government is burdened with demonstrating a historical tradition, originating at the founding, of universally prohibiting the possession of the standard-issue service rifle of the U.S. Military by all Americans. The government's historical authorities fail to make that showing.

21

The government's authorities must be considered in the form of "analogical reasoning" to section 922(o).[22] 597 U.S. at 28. The challenged regulation "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting 597 U.S. at 30). However, "'[e]verything is similar in infinite ways to everything else,'" and "one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.'" 597 U.S. at 29. The Supreme Court has thus mandated the consideration of "*at least* two metrics" when conducting this analysis: "*how* and *why*" the challenged regulation compares to the proffered historical authorities. *Id*. (emphasis added).

**The *How***

The "*how*" of 18 U.S.C. § 922(o) is affected by imposing a *total ban* on the possession of an arm by *all* of the citizenry. Of the founding authorities the government provides, z*ero* of them impose such a sweeping prohibition.[23] The "going-armed" acts from the controlling time-period criminalized the *carrying* of arms in an unusual manner to terrorize the general public, which constituted the

---

[22] The Court may not "engage in independent means-end scrutiny under the guise of an analogical inquiry" and must instead "apply faithfully the balance struck by the founding generation to modern circumstances" because "the Second Amendment is the 'product of an interest balancing *by the people*.'"). 597 U.S. at 29 n.7 (quoting 554 U.S. at 635).

[23] *See generally* Gov't Br. at 36 ("Founding").

offense of an affray; the surety laws merely imposed a bond on individuals *carrying* certain weapons. The "how" of the acts "empowered justices to confiscate the arms of a person" who committed an affray; the surety laws "authorized the imposition of bonds from individuals" who carried certain weapons. Gov't Br. at 36, 37.

Unlike those authorities, the "how" of section 922(o) broadly prohibits the simple *possession* of a class of arms by all law-abiding citizens generally. The M16 prohibition does not "involve[] judicial determinations," of individualized findings. 602 U.S. at 699. It is not "of limited duration." *Id*. It says nothing about the *carrying* of weapons. It does not permit arms possession after the issuance of "a surety of the peace." *Id*., at 695. Section 922(o) totally prohibits the possession, by all Americans, indefinitely, without exception, of the standard-issue service rifle of the U.S. Military. There is *no principle* of commonality between the "how" of section 922(o) and the founding authorities provided by the government.

The government dismisses this distinction, arguing that "restrictions on the manner of carrying firearms for unlawful purposes" should "fairly support prohibitions on the possession of firearms" that are "'dangerous and unusual.'" Gov't Br. at 43 (citation omitted). But as explained,[24] "dangerous and unusual" does not describe a class of arms; rather, it refers to *Heller*'s affray authorities, which

_____

[24] *See* Aplt. Br. at 29, 30; *supra*, at 9-12.

made it a crime to carry arms publicly in an unusual manner in order to terrorize the people. Those authorities did not "ban[]" "any class of firearms," but instead criminalized carrying arms in a manner that "terrorize[d] the people." 597 U.S. at 47; *see also* 602 U.S. at 697 ("the prototypical affray involved fighting in public," which "disrupted the 'public order.'") (citation omitted).

**The *Why***

Comparing the "*why*" illustrates even more disparity. The "why" of the government's founding authorities was "to mitigate demonstrated threats of physical violence." *Rahimi*, 602 U.S. at 698. But 922(o) says nothing about physical violence nor individualized findings. It does not "involv[e] judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.*

Importantly, the government does not explicitly explain "why" section 922(o) was codified. Its argument is particularly ambiguous when it conflates the congressional history and background of the NFA and related Senate Reports to support section 922(o). *See generally* Gov't Br. at 45, 46. That history does not indicate why Congress, more than fifty years after passing the NFA, codified section 922(o). There were no hearings, no floor debate, and there was no recorded vote on section 922(o).

Looking at the text of the short statute, the government posits that because it "exempts machineguns possessed or transferred by… the United States military," the ban's text demonstrates that Congress "consider[s] [M-16s]" to be "'primarily weapons of war.'" Gov't Br. at 50-51 (citations omitted.) A better reading of this text is surely that Congress preferred not to *disarm* the United States military. The statute "was not intended to disrupt in the slightest the current processes for supply of weaponry to our military." 132 Cong. Rec. 9600 (1986) (statement of Sen. Hatch). But none of this discussion explains *why* Congress codified section 922(o).

Nonetheless, the Supreme Court analyzed the "surety and going armed laws" that the government proffers here, and concluded that the "why" of those authorities is "to mitigate demonstrated threats of physical violence" through individual "judicial determinations." 602 U.S. at 698. The government provides *nothing* to support the proposition that the M16 prohibition was codified to mitigate demonstrated threats of physical violence. The "why" of the government's founding authorities thus are not "relevantly similar" to the "why" of section 922(o). 597 U.S. at 29.

**No Historical Tradition**

Because the government has provided no acceptable historical analogues originating at the founding, no later authorities provided by the government sustain

any claimed tradition. "[T]o the extent later history contradicts what the text says, the text controls." *Id*., at 36. This Court must "'follow the principle of party presentation.'" *Id*., at 25 n.6 (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). "[T]he historical record compiled by the [government]," *id*., does not "identify an American tradition justifying" the ban on the possession of the standard-issue service rifle of the United States Military. *Id*., at 70. Pursuant to the "text-and-history standard," the prohibition "is therefore unconstitutional." *Id*., at 39.

The government asserts that "machineguns became a 'general societal problem' after World War I." Gov't Br. at 41 (citing 597 U.S. at 26). This is a misreading of *Bruen*. The Court did not suggest that protected Second Amendment *conduct* (e.g., possession of arms) may be construed as a *problem*. Rather, the Court acknowledged that the *abuse* of a right may present a problem. Indeed, the government provides no evidence in its brief that an *object, protected arms*, presented or currently presents a general societal problem.

Rather, the government's own authorities demonstrate that Congress has understood machineguns to be "'*used*… by criminals or gangsters,'" "'*used* by racketeers and drug traffickers,'" and "'likely to be *used* for criminal purposes.'" Gov't Br. at 45 (citations omitted) (emphasis added). It is therefore the criminal *abuse* and *misuse* of protected arms that may be perceived as a general societal problem. Of course, criminal *misuse* of firearms has been a "societal problem" since

well beyond "the 18th century." 597 U.S. at 26. Indeed, the government provides criminal firearm regulations dating as far back as 1328. *See* Gov't Br. at 35.

To be sure, law-abiding "citizens who own and shoot legal machineguns have complied with the most rigorous firearms laws imaginable," and it "is virtually unheard of for such a law[-]abiding citizen to use his or her machinegun in any kind of violent criminal offense… there is not a single instance on record of a legally possessed machinegun having been used in a predatory street crime." 132 Cong. Rec. 9603 (1986) (statement of Sen. Hatch).

"The Constitution leaves the [government] a variety of tools for combating [gun violence]." *Heller*, 554 U.S. at 636. When Congress first contemplated regulating machineguns, the Attorney General was questioned as to whether the government possessed such powers. Attorney General Cummings advised Congress that "if we made a statute absolutely forbidding any human being to have a machine gun, you might say that there is some constitutional question involved. But when you say '[w]e will tax the machine gun…' you are easily within the law".[25] Indeed, the NFA has stood for almost a century as a permissible regulation of machineguns, and DeWilde simply desires to comply with its stringent requirements. Despite the unconstitutionality of section 922(o), violations of the NFA impose virtually-

---

[25] National Firearms Act: Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 8 (1934).

identical penalties as section 922(o), and U.S. Sentencing Guidelines pertaining to crimes involving machineguns remain valid.

"Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well trained police forces provide personal security, and where gun violence is a serious problem." 554 U.S. at 636. But "it is not the role of [the Court] to pronounce the Second Amendment extinct." *Id*. In the spirit of Attorney General Cumming's acknowledgement, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id*. These include the absolute prohibition of the lineal descendant of the musket.

## **CONCLUSION**

For the reasons stated above and in DeWilde's opening brief, the Court should vacate and reverse the order and judgment of the district court.

DATED this 23rd day of December, 2024.    Respectfully Submitted,

*/s/ Jake S. DeWilde*

Jake S. DeWilde

PO Box 267

jake.dewilde@gmail.com

Wapiti, WY 82450

(307) 587-4524

## Certificate of Compliance with Type-Volume Limit
## Typeface Requirements and Type Style Requirements

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6297 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point typeface.

DATED this 23rd day of December, 2024.     Respectfully Submitted,

*/s/ Jake S. DeWilde*

Jake S. DeWilde

PO Box 267

jake.dewilde@gmail.com

Wapiti, WY 82450

(307) 587-4524

**Certificate of Service**

I, Jake DeWilde, hereby certify that I filed the foregoing document via the Court's electronic-filing system; all parties in this case have consented to electronic service; and the electronic filing of the foregoing document constitutes proof of service to all parties in this case.

DATED this 23rd day of December, 2024.    Respectfully Submitted,

*/s/ Jake S. DeWilde*

Jake S. DeWilde

PO Box 267

jake.dewilde@gmail.com

Wapiti, WY 82450

(307) 587-4524